Judob Simpson
delivered the opinion of the Court.
Samuel Nunn, who resided in Crittenden county, was the owner of a large number of slaves, and of other property of very considerable value. He never married, and had no children or descendants. He had resolved to emancipate his slaves, having, as he expressed himself, determined that they should never serve any other person. In January 1844, he had a will drawn up by a lawyer to whom he had applied for the purpose, by the provisions of which, all his slaves were to be entitled to their freedom immediately after his death, except three of them, and one of the three was to be free at the expiration of six years. Of the remaining two, one was a female whose children, either born before or after the testator’s death, were to be free at the age of twenty-one. He devised portions of his estate to Chesley Nunn and Samuel Nunn, and required them to become the securities of the persons he had emancipated, so far as the County Court might demand security to be given that the persons emancipated would not become a charge upon the county; and provided expressly that a failure or refusal by Chesley Nunn or Samuel Nunn to comply with that requisition, should produce a forfeiture of the estate he devised to them.
He also devised a considerable part of his estate to the slaves he emancipated. But this will was not executed by him so as to be effectual either in manumitting his slaves, or disposing of his real estate. He subscribed his name to it, but never had it attested by any subscribing witnesses, although he was informed by his lawyer that it was necessary to its validity, that it should be attested by two witnesses.
*240 Afterwards in October 1845, he executed under his hand and seal, a bill of sale of all his slaves, being upwards of thirty in number, to John E. Prow, purporting to convey them to the latter as slaves for life. The consideration stated in the bill of sale was five hundred dollars. It also contains the following statement, made by the grantor: ■“ Having at one time made a will which was to free the above named negroes, on calling them up and enquiring of them, and explaining the matter to them, all of them that were old enough to have a judgment upon the matter, requested to be sold and live with the said John E. Prow, rather than risk giving security. I do therefore sell and deliver them unto the said JohnE. Prow in presence, &c.”
' Another instrument of writing was executed at the same time, by Samuel Nunn, purporting to be an agreement between the said Nunn of the one part and the said John E. Prow of the other part, in which it is stated that the said Nunn had that day hired of the said .Prow the same slaves contained in the bill of sale, for and during the natural life of the former, for which he bound himself to furnish them with good clothes suitable to the season, to take good care of them and treat them with humanity. The writing then proceeds, substantially as follows: “ Having at one time made a will emancipating the above named negroes, after consulting my own mind and the negroes on the subject, I concluded with them that I would trade them to the said Prow, which they preferred rather than run the risk of giving security after my death, and in my will I was to give them some land and money and other property, and as the said Prow has removed all responsibility upon them to give security, I therefore bind my heirs, executors, &c., to pay all the devises made by me to the above named negroes, unto John E. Prow, and after my death the said John E. Prow is authorized to take possession of said negroes, and to receive from my executors the devises I have heretofore made to them, &c.
A will to 'be effectual to pass slaves, must be executed in the same manner as to pass lands.— And a will which has been offered for probate and rejected cannot be proved and used .collaterally to prove emancipation, of slaves.
This instrument of writing as well as the bill of sale was attested by two witnesses; and in the month of February 1846, they were proved before the Clerk of the Crittenden County Court, and recorded.
Samuel Nunn having afterwards died, the writing purporting to be his last will and testament was offered for probate, and rejected by the County Court of Crittenden. From the decision of the County Court an appeal was taken to the Circuit Court of the same county, where the suit after having been continued for several terms, was finally dismissed agreed. The slaves were not made parties in either Court to these proceedings.
This suit in chancery was subsequently'instituted by the slaves claiming their freedom, either’ under the writings already' adverted to, or by virtue of an alleged written or parol agreement betwmen Nunn and Prow, binding the latter to emancipate them upon the death of the former.
The will is not executed in compliance with the Statute., It has no attesting witnesses, and is not therefore sufficient to pass the title to either slaves or land. And as a devise to slaves of their freedom must be executed with the same forms of attestation as a devise of land, (Mullins, &c. vs Wall, &c., 8 B. Monroe, 445,) it is not effectual for the emancipation of the complainants, nor would it sustain their claim to freedom if it were allowable, which it is not, to set it up as a will in a collateral proceeding to establish the rights which it professes to grant, after its rejection by the County Court which had exclusive jurisdiction of its. probate, and while the sentence of that Court remains in force; Jacob vs Pulliam, (3 J. J, Marshall, 200.) Chastine vs Ford, (5 Littell, 263.)
But it is contended that the writings executed by Nunn to Prow, recognize the execution of the will, a-nd that the instrument under which Nunn became the ostensible hirer of the slaves, and in which he stipulates *242 that Prow should after his death have the estate devised in his will to the slaves, is a publication of his will, under the requisite formalities, there being two attesting witnesses to it, and that these instruments and the will should be regarded as one writing, and as such they constitute a valid testamentary disposition of the testator’s estate.
But if it were so, these writings should have been produced to the probate Court, and cannot be set up and relied upon as a-will in this suit. These writings however, if they are to have any operation upon the will, must be considered as a revocation of so much of it as devises to the slaves their freedom. The obligor after stating that he had at one time made a will to emancipate his slaves, declares explicitly that he had concluded to trade them to John E. Prow. This declaration and the conveyance made in consequence of the determination he had formed, would have effected an absolute revocation of so much of the will as provided for the manumission of his slaves, even had the will been executed with all the form and solemnity requisite to its validity.
It is also contended that the writings themselves liberally construed, manumit the slaves, and that such was the real object and design of their execution. It may be implied from the contents of the writings that the slaves were to have a sort of quasi freedom, that Prow was invested with the title to them as master, for the purpose of controlling their actions, holding them in proper subjection, and avoiding the necessity of giving any security in the County Court. But such a condition is unknown to the law. They are slaves, or they are absolutely free. They have been left in a state of slavery. There is nothing in the writings which can, without doing violence to the clear and unambiguous meaning of the language used, be construed into a manumission of the slaves. The owner has attempted to retain them in a state of slavery, and yet impart to *243 them, as may be implied from .the writings executed by him, some of the advantages of freedom. The law does not tolerate a qualified state of slavery; the object he had in view can only be effected by the voluntary action of the substituted master, its accomplishment cannot be enforced through legal instrumentality.
Though an agreement by the owner of a slave to emancipate him, made with a third person, might authorize such person or his representative to enforce the contract, yet the slave cannot maintain a suit for its enforcement: 8 S. Mon. 633, 548,)
*243 But it is argued that Prow bound himself to Nunn, •either by a written or parol agreement to manumit the slaves upon the death of the latter, and as the contract was for the benefit of the slaves, they can sue for its enforcement. That an agreement of some kind existed between them upon that subject, is-fully established by the testimony. From the object and nature of the writings executed by Nunn, it may be doubted however, whether any actual manumission was intended to be made. If he had designed an absolute emancipation of them, the arrangement with Prow was wholly unnecessary; the end could have been more readily attained by the execution of a valid' will. - And as' he had been informed fully of the manner in which a will should be executed to make it effectual for the purpose, the legitimate deduction from his failure to execute it in that way, is, that it was not his intention that they should be fre*e upon* his death. The most reasonable conclusion from all the evidence upon the point, both oral and written, is, that Prow was to retain the title to them and keep them nominally as slaves, but they were to be substantially free,_ and to enjoy many of the advantages and privileges of free persons. An arrangement which as before remarked, depends entirely for its fulfillment and observance, upon the good faith and honesty of Prow, as the substituted master and owner of the slaves.
If however there were an express agreement upon the part of Prow to manumit the slaves after the death of the former owner, that agreement although it would authorize the representatives of Nunn to insist upon its execution, and to bring a suit for that purpose, does *244 not enable the slaves to bring a suit for its enforcement in their own names; Gatliff’s adm’r vs Rose, &c., (8 B. Monroe, 633.) Willis vs Bruce, &c., (same, 548.) Dunlap vs Archer, (7 Dana, 30.) Persons wrongfully held in slavery, may bring a suit to establish their claim to freedom, and to be delivered from illegal bondage ; but to be able to sue they must be free when the suit is instituted. Slaves cannot maintain a suit in their own names, to have a contract for their emancipation specifically executed,(because not being free when the suit is brought as is apparent from the contract itself, and the object of the suit, they cannot assert any right, and also because, they cannot from their condition be regarded as parties to the contract, although it was for their benefit. The contract therefore can be enforced alone by the parties to it, or by some person having a right to do so, growing out of his relation to one of the parties.
Harlan for plaintiffs; Gorin and McElrmj for defendants.
Inasmuch as the suit cannot be maintained by the present complainants, in their own names, it is not material whether all the parties had been served with process or not, when the cause was heard and the bill dismissed. It would be useless and’ unavailing to reverse it and send it back for proper parties, when the complainants are not entitled to any relief upon any aspect of the case as presented in their bill.
Wherefore the decree is affirmed.